IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF KANSAS


DONALD L. PHELPS, et al.,          )
                                    )
                    Plaintiffs,     )    **CIVIL ACTION**
                                    )
v.                                  )    No.  03-1282-MLB
                                    )
GARY M. KRAMER, M.D.,               )
                                    )
                    Defendant.      )
_____ )


## MEMORANDUM AND ORDER

This memorandum and order represents a continuing evaluation of defendant's motion for partial summary judgment (Doc. 36).  By its memorandum and order of June 7, 2006, the court denied defendant's motion but, at the same time, ordered a <u>Daubert</u> hearing with respect to the opinion of Lloyd Dan Montgomery, a psychiatrist, on whose opinion plaintiffs are relying that their decedent's suicide was caused by the medical negligence of defendant, a surgeon.  If Dr. Montgomery is not permitted to offer an opinion regarding defendant, then defendant will be entitled to partial summary judgment.

Plaintiffs objected to the necessity for a <u>Daubert</u> hearing, but the court overruled the objection in its order of July 27, 2006 (Doc. 50).  <u>See</u> <u>also</u> <u>United States v. Zhang</u>, 458 F.3d 1126, 1129 (10th Cir. 2006) (underscoring a district court's duty to act as a gatekeeper). The hearing was held on July 31, 2006 and thereafter, the parties submitted letter briefs and a memorandum regarding matters raised at the conclusion of the <u>Daubert</u> hearing (Docs. 51, 52 and 53).  A transcript of Dr. Montgomery's testimony has been prepared and the court will now revisit defendant's motion for partial summary judgment

in view of Dr. Montgomery's testimony and the authority cited by the parties.

Background

The facts set forth in the court's memorandum and order of June 7, 2006 are adopted by reference.  The court and the parties recognize that a jury will have to decide the medical negligence claims arising out of defendant's orthopedic treatment of plaintiffs' decedent, Shannan Valdez.  Defendant's motion for partial summary judgment, however, deals only with plaintiffs' wrongful death claim against defendant which plaintiffs outlined in the pretrial order as follows:

> Pertaining to the wrongful death claim(s) arising from and as a consequence of Defendant Kramer's actions/inactions, three (3) interacting conditions were involved: (a) Clinical depression as a result of three months in severe pain and uncertainty caused by Defendant's negligence and breach of the applicable standard of care; (b) marital discord caused and/or augmented by Defendant's negligence and breach of the applicable standard of care and; (c) alcohol abuse augmented by Defendant's negligence and breach of the applicable standard of care.

(Doc. 38 at 5).

This language is taken verbatim from Dr. Montgomery's written report with the exception of the phrase "augmented by defendant's negligence and breach of the applicable standard of care."  In other words, plaintiffs claim not merely that defendant's orthopedic care of Ms. Valdez constituted orthopedic medical negligence, but also that defendant's alleged orthopedic medical negligence caused Ms. Valdez's suicide which occurred approximately nine months after defendant's orthopedic treatment of Ms. Valdez ended.  If plaintiffs can succeed in getting their wrongful death claim before the jury, they will have the opportunity to recover damages which, to some extent, are

-2-

different from and, from plaintiffs' perspective, potentially greater than those recoverable on their medical negligence claim (see and compare PIK 3d Civ. 171.02 and 171.30).

When Dr. Montgomery prepared his report, he did not opine that Ms. Valdez's suicide was the result of defendant's orthopedic negligence or that defendant could or should have foreseen Ms. Valdez's suicide.[1]  When Dr. Montgomery's deposition was taken, however, he referred to defendant's orthopedic treatment as "malpractice," and opined that the malpractice had a "very significant effect" on Ms. Valdez's suicide, even though he admitted that he is not an expert in orthopedic medicine.[2]  Of course, whether defendant's orthopedic care of Ms. Valdez constituted medical negligence is contested and will have to be resolved by a jury.  Therefore, Dr. Montgomery's deposition testimony that Ms. Valdez's suicide resulted from defendant's medically negligent treatment or "malpractice" lacked foundation and, in addition, raised significant issues regarding causation based on the "separate but interacting conditions" opinion set forth in Dr. Montgomery's report, which will be discussed presently.

---

[1]The report mentions defendant only once in connection with a telephone call made to defendant by Ms. Valdez's mother in December 2001.

[2]This testimony occurred during Dr. Montgomery's deposition of October 13, 2005.  Dr. Montgomery was deposed one other time: April 21, 2001 in connection with a worker's compensation claim.  In the excerpts provided, Dr. Montgomery mentioned his opinion that Ms. Valdez's suicide resulted from the coincidence of her depression, marital problems and alcohol use.  He admitted that there was <u>not</u> an unbroken chain of causation between her original accident and her suicide but rather, to use his words, "There were other intervening factors" which he did not specifically identify.  Dr. Montgomery did not mention defendant.

The court now turns to Dr. Montgomery's testimony at the <u>Daubert</u> hearing.   In response to plaintiffs' counsel's leading question whether as a result of defendant's treatment, Ms. Valdez apparently suffered severe physical problems for which she became seriously depressed, Dr. Montgomery responded "yes."  Dr. Montgomery explained that his opinions are based on reliable principles and methods but the only opinion he expressed during his direct examination was contained in the following testimony:

> Q.   And is one of the facts in this case that as a result of the treatment of Dr. Kramer, Ms. Valdez apparently suffered severe physical problems for which she became seriously depressed?
>
> A.   Yes.
>
> Q.   And that is one of the facts upon which you rely in this case in forming your opinion that her suicide was in part caused by the injuries she suffered as a result of the treatment of Dr. Kramer?
>
> A.   That's correct.

On cross examination, Dr. Montgomery reiterated his opinion that there were three separate but interacting conditions which led to Ms. Valdez's suicide.  He also testified that Ms. Valdez's depression as the result of the pain and suffering she sustained in the accident, standing alone, did not cause her suicide.  When asked if defendant should have foreseen Ms. Valdez's depression after he discovered the ankle fracture in January 2002, Dr. Montgomery answered: "Well, the – this seems to be an unusual form of getting at this, but certainly I think a prudent and sensitive practitioner should have known that

she would have been in great distress.  And, in fact, I know that he did actually try to treat her depression with antidepressant medicines."  When the court  pointed out that Dr. Montgomery had eschewed any ability to testify that defendant had committed orthopedic malpractice, yet had opined that malpractice was a factor in the suicide, Dr. Montgomery responded:

> A.   Well, malpractice was a very unfortunate term and if, you know, I use that – well, you know, that's a legal term – that's a legal term, just as incompetence is a legal term.  But I was using it as a medical term.  What it should have been revised to was that failure to examine, failure to examine and identify the full extent of this woman's injuries was a significant factor in her suicide.

> Q.   (By defense counsel) And based upon that, do you have an opinion as to whether or not Dr. Kramer should have foreseen that she would commit suicide seven to eleven months after he ceased treating her?

> A.   Well, I would say that Dr. Kramer could have foreseen that, you know, missing that type of thing would put somebody in severe physical and emotional distress.

> Q.   But your opinion is also that that severe and emotional– or severe emotional distress was not the direct cause of her taking her own life; correct?  There were other factors that had to be present?

> A.   That's correct.

> Q.   And is it your opinion that Dr. Kramer should have foreseen in March of 2002, the convergence of all

three of those factors seven to eleven months after he ceased treating the patient?

A.   Well, no, it's not my contention that he should have been able to see the convergence of factors.  It is my contention that there are certain things that we're all expected to do.  An analogy would be if I see somebody who's had a head injury, I always have to be concerned about the cervical spine.  If you see somebody that's got a knee injury, you always have to be concerned about problems distal to that.  His lack of picking that up was a very significant factor in this woman's extreme, extreme hopelessness that I saw when I did the consult with her in the intensive care unit and she felt that she was gonna lose her leg.

Q.   And I understand that, Doctor.  Do you agree that the prediction of suicide behavior is based on inexact criteria that are relatively poor at predicting the behavior of any given individual?

A.   I would agree with that, yes.

Finally, Dr. Montgomery offered his opinion that defendant deviated from the standard of care in his treatment of Ms. Valdez:

Well, and what I'm offering is not necessarily an orthopedic opinion.  It's just a general medical opinion.  You know, the kind of thing that doctors should know.  And you don't – and not at a very high level.  I mean, that's not a very high level of medical expertise to know that you check the whole limb.

-6-

Discussion

In its June 7, 2006 memorandum and order, the court set forth what it believed is an accurate statement of the law pertaining to suicide:  suicide is viewed as an independent intervening act which the original tortfeasor could not have reasonably been expected to see.  Thus, in order to recover upon their wrongful death claim, plaintiffs must prove that Ms. Valdez's suicide could have been reasonably foreseen by defendant based upon his treatment of Ms. Valdez.

Plaintiffs disagree with the court's view of the law.  They cite Elliot v. Turner Construction Co., 381 F.3d 995 (10th Cir. 2004) but that case involves Colorado law and has nothing to do with the foreseeability of suicide.  On the other hand, McDermott v. Midland Management, Inc., 997 F.3d 768 (10th Cir. 1993) does involve Kansas law and states the general proposition that liability will still attach despite the existence of an intervening cause where the intervening cause was foreseeable or might reasonably have been foreseen.  However, McDermott does not involve suicide or medical negligence and standard of care issues.

The third case relied upon by plaintiffs is Tinkler v. United States by Federal Aviation Administration, 982 F.2d 1456 (10th Cir. 1992).  Tinkler is a wrongful death case brought under the Tort Claims Act in which it was claimed that plaintiff's decedent's death in an airplane crash was caused by an FAA employee's negligent failure to furnish proper weather information to the pilot of the airplane in which the decedent was a passenger.  The trial court found that the pilot was grossly negligent in flying without ascertaining accurate

weather information and that this negligence was both an intervening and superceding cause of the crash which cut off any negligence of the FAA employee.  The court also ruled that the pilot's actions of flying in bad weather were unforeseen to the FAA employee.  Judgment was entered for the FAA.

On appeal, the decedent's representative contended that the trial judge misapplied Kansas law regarding foreseeability.  Kansas law, the Tenth Circuit explained, is that ". . . in fixing the proximate cause of injury or damage, it is not required that a 'specific injury would probably result but only that some injury would likely result therefrom.'"  The court also recognized that under Kansas law, intervening negligence will not cut off the liability of the original tortfeasor if the original tortfeasor should reasonably have foreseen the intervening negligence.  982 F.2d at 1466-67.  Nevertheless, the Tenth Circuit affirmed the district court's decision that the pilot's intervening negligence cut off the liability of the FAA.  Obviously, Tinkler did not involve medical negligence or suicide.

Finally, plaintiffs direct the court's attention to the recent case of Estate of Pemberton v. John's Sports Center, Inc., 135 P.3d 174 (Kan. App. 2006) which involves the suicide of a young man with an extensive history of mental problems.  Plaintiff's theories of recovery were negligence per se and negligent entrustment by the merchant who sold the weapon used by the young man to commit suicide. The court observed:

> The problem in analyzing negligent entrustment claims is the confusion surrounding the concept of foreseeability. In determining whether the defendant owed a duty to control the conduct of a third person, our Supreme Court has indicated there was no duty absent a showing the risk of

harm was foreseeable. See <u>South v. McCarter</u> 280 Kan. 85, 102-06, 119 P.3d 1 (2005). The court stated:

"'"Foreseeability, for the purpose of proving negligence, is defined as a common-sense perception of the risks involved in certain situations and includes whatever is likely enough to happen that a reasonably prudent person would take it into account. [Citation omitted.] An injury is foreseeable *so as to give rise to a duty of care* where a defendant knows or reasonably should know that an action or the failure to act will likely result in harm."' [Citations omitted.]" (Emphasis added.) 280 Kan. at 103-04, 119 P.3d 1.

Generally, whether a duty exists in a tort case is a question of law. 280 Kan. at 94, 119 P.3d 1.

In other contexts, however, our Supreme Court has addressed foreseeability as a fact question related to whether a duty was breached. For example, in <u>Long v. Turk</u>, 265 Kan. 855, 962 P.2d 1093 (1998), a failure to secure a dangerous instrumentality case, the question was whether the gun owners exercised the highest degree of care in securing their gun. "[W]hether the risk of harm is reasonably foreseeable is a question for the trier of fact. Only when reasonable persons could arrive at but one conclusion may the court decide the question as a matter of law." 265 Kan. at 865, 962 P.2d 1093.

As the following cases show, whether a duty existed or whether a duty was breached, the liability of a gun seller generally turns on the facts of each case.

* * *

Nevertheless, to impose liability on JSC, the Pembertons needed to show that JSC's employees had actual or constructive knowledge that Josh posed an unreasonable risk of harm to himself or to others. Consequently, our focus should not be on what kind of firearms purchaser Josh happened to be. Instead, our focus should be on what JSC's employees knew when they sold the shotgun to Josh. The facts show that JSC's employees had no reason to believe that Josh was incompetent to purchase a firearm.

<u>Id.</u> at 189 and 191. The Court of Appeals ultimately affirmed the district court's decision to grant summary judgment in favor of the defendant. There is no discussion about the admission of testimony regarding whether a suicide after negligent medical treatment is

foreseeable.

Having considered plaintiffs' proffered cases, the court adheres to its previous view of the law pertaining to suicide:

> Courts have long been reluctant to recognize suicide as a proximate consequence of defendant's wrongful act. Watters v. TSR, Inc., 904 F.2d 378, 383 (6th Cir. 1990) (citing Scheffer v. Washington City V.M. & G.S.R.R., 105 U.S. 249, 15 Otto 249, 26 L. Ed. 1070 (1881)). Generally, the act of suicide is viewed as an independent intervening act which the original tortfeasor could not have reasonably been expected to foresee. Id.; see also Salsedo v. Palmer, 278 F. 92 (2d Cir. 1921); Lancaster v. Montesi, 216 Tenn. 50, 390 S.W.2d 217 (1965). In Elliott, the court stated: Natural and probable consequences are those which human foresight can anticipate because they happen so frequently they may be expected to recur. It has also been said that it must appear the injury was anticipated or that it reasonably should have been foreseen by the person sought to be charged with liability. 203 Kan. at 284, 454 P.2d 124. An exception arises when the conduct of the tortfeasor causes a mental condition which results in an uncontrollable impulse leading to suicide. See, e.g., Jamison v. Storer Broadcasting, Co., 511 F.Supp. 1286 (E. D. Mich. 1981); Hamilton v. Chaffin, 506 F.2d 904 (5th Cir. 1975); Tate v. Canonica, 180 Cal. App.2d 898, 5 Cal. Rptr. 28 (1960).

Burdett v. Harrah's Kansas Casino Corp., 294 F. Supp. 2d 1215, 1234-35 (D. Kan. 2003); see also Focke v. United States, 597 F. Supp. 1325, 1351-52 (D. Kan. 1982).

The court agrees with plaintiffs that foreseeability of Ms. Valdez's suicide by defendant is an issue and, for purposes here, will accept plaintiffs' argument that foreseeability is a jury issue. See Swearngin v. Sears Roebuck & Company, 376 F.2d 637, 640 (10th Cir. 1967) ("It is apparent there was a conflict in the opinion of the experts who had been qualified and were accepted by the trial court. It was proper for the jury to choose which expert it believed."). The issue is whether Dr. Montgomery is "qualified" under applicable federal law to render an opinion regarding the foreseeability of Ms.

-10-

Valdez's suicide by Dr. Kramer.

Kansas recognizes wrongful death actions based on medical negligence. See, e.g., Davidson v. Denning, 259 Kan. 659 (1996). As in any medical negligence case, expert testimony is necessary to establish standard of care, deviation therefrom, injury and causation. Negligence is never presumed from a bad outcome. Watkins v. McAllister, 30 Kan. App. 2d 1255, 1258 (Kan. App. 2002); Cunningham v. Riverside Health System, Inc., 33 Kan. App. 2d 1, 6-8 (2003). Death, of course, is the worst imaginable outcome.

The admissibility of expert testimony is governed by federal, not state, law. To render an admissible opinion, the expert must first be qualified. Then, the expert's opinion must be based on sufficient facts or data. Next, the opinion must be the product of reliable principles and methods which the expert applied reliably to the facts. The bottom line is that the expert's testimony must be helpful to the trier of fact. City of Wichita v. Trustees of APCO Oil Corp. Liquidating Trust, 306 F. Supp. 2d 1040, 1108-11 (D. Kan. 2003) (discussing the requirements of the Federal Rules of Evidence and Daubert v. Merrell Dow Pharm. Inc., 509 U.S. 579, 113 S. Ct 2786, 125 L. Ed. 2d 469 (1993) pertaining to the admissibility of expert testimony).

Now, to apply the aforesaid standards to Dr. Montgomery's testimony and the facts of this case. Dr. Montgomery is a qualified psychiatrist. To give him the benefit of the doubt, he did identify at least one aspect of the standard of care applicable to an orthopedic physician whose patient is experiencing continued pain after surgery and is depressed: treatment with antidepressant

-11-

medications.  Dr. Montgomery acknowledged that defendant provided such treatment.  He also testified that ". . . failure to examine and identify the full extent of this woman's injuries was a significant factor in her suicide."  But he was not asked to amplify on this statement and the court will not speculate about what Dr. Montgomery meant by it.

The real problem with Dr. Montgomery's testimony is that he never said what would get him past the Rule 702 and <u>Daubert</u> requirements. His opinion clearly is that Ms. Valdez's suicide resulted from the combination of three factors: depression as the result of her injury and arguably negligent surgery, family problems and alcohol abuse. He testified that all three factors had to exist; in other words, that Ms. Valdez would not have committed suicide merely because she was depressed.  Dr. Montgomery did not identify, as a factual predicate for his opinion regarding defendant, that defendant was aware of Ms. Valdez's marital discord or her alcohol abuse.  Indeed, he eschewed an opinion that defendant should have foreseen the convergence necessary to explain Ms. Valdez's suicide: "Well, no, it's not my contention that he should have been able to see the convergence of factors."  He also agreed that prediction of suicidal behavior is based on inexact criteria.

Under these circumstances, the court finds that Dr. Montgomery's testimony regarding defendant's conduct fails to show that defendant was aware of the essential facts Dr. Montgomery would require to

foresee a possible suicide.[3]  He does not contend that defendant should have foreseen Ms. Valdez's suicide.  Thus, Dr. Montgomery does not supply the "reasonable foreseeability" element necessary under Kansas law to get over the intervening cause hurdle.  Therefore, his testimony will not be helpful to the jury and without Dr. Montgomery's testimony, plaintiffs cannot make out a submissible wrongful death case.

Conclusion

Upon further consideration, defendant's motion for partial summary judgment (Doc. 36) is sustained.

A motion for reconsideration of this order is not encouraged. Any such motion shall not exceed three pages and shall strictly comply with the standards enunciated by this court in Comeau v. Rupp, 810 F. Supp. 1172 (D. Kan. 1992).  The response to any motion for reconsideration shall not exceed three pages.  No reply shall be filed.

IT IS SO ORDERED.

Dated this   30th   day of October 2006, at Wichita, Kansas.


s/ Monti Belot
Monti L. Belot
UNITED STATES DISTRICT JUDGE

---

[3]When Dr. Montgomery evaluated Ms. Valdez in December 2001, he signed a report which notes that Ms. Valdez had expressed a "wish to die" to her mother and to her husband, suffered from a major depressive disorder and alcohol abuse and had a "partner relationship problem."  Dr. Montgomery did not express an opinion that Ms. Valdez presented a suicide risk.